Filed 7/23/24  Marriage of Herrera CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of MARIBEL HERRERA and MICHAEL HERRERA. | |
| MARIBEL HERRERA,<br><br>    Respondent,<br>v.<br>MICHAEL HERRERA,<br><br>    Appellant. | A162657<br><br>(Contra Costa County<br>Super. Ct. No. MSD17-04913) |

This is an appeal from a judgment in a marital dissolution action between Maribel Herrera and Michael Herrera.[1]  Michael contends the trial court erroneously found that:  (1) under the so-called "*Moore-Marsden* rule,"[2] the community had a pro tanto interest in real property that Michael had purchased before marriage; (2) the proceeds of a fire insurance policy and a refinancing of a separate property loan during marriage were community

---

[1]     We use the parties' first names for convenience, intending no disrespect.

[2]     See In *re Marriage of Moore* (1980) 28 Cal.3d 366 (*Moore*) and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 (*Marsden*).

1

property; and (3) the community was entitled to so-called *Watts* charges[3] for Michael's occupation of the marital residence between the date of separation and closing arguments. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 1994, prior to the parties' marriage, Michael purchased real property located on Paul Scarlett Drive in Concord (hereafter the Property) for $186,000 and made payments on the mortgage from his separate property earnings. Maribel came from the Philippines in 1996, and the parties were married in August 1996. They lived at the Property during the marriage. At all relevant times, title to the Property remained solely in Michael's name.

In February 1999, Michael submitted an application to refinance the mortgage on the Property. In his application, Michael identified his employment earnings and listed the Property and various bank accounts and vehicles as assets. He also indicated that title to the Property would be held as his sole and separate property as a married man.

At trial, Michael testified he was told by a loan officer that the lender wanted to have Maribel's name on the loan, but Maribel refused to cosign the loan. Michael told Maribel that in order to not be on the loan, she would have to sign an interspousal transfer grant deed (ITGD). Michael testified that Maribel "chose to sign" the ITGD, and that "it was explained in full detail by Helen Stone," a close friend of Michael's who witnessed Maribel's signing of the ITGD.

The ITGD stated in relevant part: "ON March 16, 1999, FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged Maribel Herrera, wife of the grantee hereby GRANT(S) to Michael O. Herrera, a married man as his sole and separate property the real property

---

[3]    See *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*).

2

in the City of CONCORD, County of Contra Costa, State of California, described as: Lot 73, Map of Subdivision 2989, filed January 5, 1962, in Map Book 85, Page 37, Contra Costa County Records. It is the intention of the grantor herein to relinquish all of her right, title and interest, whether community property or otherwise, in and to the hereinabove described property and to vest said property in the above grantee as his separate property." (Some boldface type omitted.)

Maribel testified that Michael "told me to sign the deed" because he "need[ed] to refinance the house and buy a vehicle" for his work commute, and that at the time, "when I signed, I feel pressured." Maribel said she received no money or anything else in exchange for signing the ITGD, and that when she signed it, she had not heard of a *Moore/Marsden* calculation and did not know that she had any interest in the Property. Maribel read and signed the ITGD "quick[ly]" because she trusted that Michael would "take care of our finances. I don't have a job. I'm taking care of our first child." Maribel further explained, "And if I don't sign it, what's my choices here? I will end up paying the mortgage if something happens to him. And I don't know anything about this *Moore-Marsden*. I don't have no knowledge about loans and properties. I was just there for Michael to support him on whatever we need. Then I sign it." Maribel testified she understood the effect of the ITGD was that she would not be responsible for the refinance loan.

The mortgage on the Property was successfully refinanced in March 1999.

Thereafter, in October 1999, a malfunctioning stove caused a fire that damaged the Property. Michael maintained a fire insurance policy he had purchased at the time of refinancing, and he paid the premiums on the policy

from his employment earnings. The fire insurance proceeds were used to purchase appliances and materials to "essentially rebuil[d] the entire home." Michael testified the remaining $150,000 in proceeds were placed in various bank accounts, including a joint account shared with Maribel, and separate IRA accounts for each of them.

The refinanced mortgage was paid off in June 2015. All payments on the refinanced mortgage were made with Michael's earnings.

The parties separated on October 10, 2017, and Maribel filed a petition for dissolution of marriage on October 20, 2017. Trial was held on various dates in August and September 2019. The trial court heard testimony from Maribel, Michael, Brandon Carpenter (Maribel's forensic accounting expert), and Tom Blair (the court's appraisal and valuation expert). The parties submitted written closing arguments on January 19, 2021.

In March 2021, after issuing a proposed statement of decision and receiving Michael's objections thereto, the trial court issued its final statement of decision finding in favor of Maribel on all issues. The court found, in relevant part, that although the Property was Michael's separate property, the community had a pro tanto interest in it under the *Moore-Marsden* rule because community property funds (Michael's earnings during marriage) had been used to pay down the debt. In so concluding, the court rejected Michael's arguments that the *Moore-Marsden* rule had been abrogated or superseded by statute, and that Maribel had waived her share of the community interest by executing the ITGD. The court further found the ITGD did not transmute the community's interest in the Property into Michael's separate property because Michael did not rebut the legal presumption of undue influence that arises whenever there is a transfer from one spouse to another that gives one spouse an unfair advantage.

4

The trial court further determined the loan proceeds from the 1999 refinancing were community property because Michael did not overcome the presumption that proceeds from a loan incurred during marriage are presumed to be community property. Specifically, Michael did not demonstrate the lender relied solely on his separate property when it approved the loan. The court also found the fire insurance proceeds were community property because the policy was purchased with community funds. The court then concluded the community was entitled to *Watts* charges for Michael's sole occupation of the Property between the date of separation and the parties' submission of closing arguments.

Based on the calculations prepared by forensic accounting expert Carpenter, the trial court apportioned the interests in the Property as 29.08 percent Michael's separate property and 70.92 percent community property. The court further concluded, based on the then-current appraisal value of the Property of $615,000, that Michael's total interest in the Property was $396,927.50 ($218,072.50 for his share of the community interest plus $178,855.00 for his separate property interest), and Maribel's share of the community interest in the Property was $218,072.50. The court additionally found, based on the Property's fair rental value of $3,200 per month and the community's 70.92 percent interest, that Michael owed $42,560 in *Watts* charges to Maribel for his 28 months of postseparation occupation of the Property. In total, the court ordered Michael to make an equalizing payment to Maribel of $260,632.50.

This appeal followed.

## DISCUSSION

"In a marital dissolution proceeding, a court's characterization of the parties' property—as community property or separate property—determines

5

the division of the property between the spouses. [Citations.] Property that a spouse acquired before the marriage is that spouse's separate property. (§ 770, subd. (a)(1).) Property that a spouse acquired during the marriage is community property (§ 760) unless it is (1) traceable to a separate property source [citations], (2) acquired by gift or bequest (§ 770, subd. (a)(2)), or (3) earned or accumulated while the spouses are living separate and apart (§ 771, subd. (a)). A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399–1400 (*Valli*).)

" 'The trial court's findings on the characterization and valuation of assets in a dissolution proceeding are factual determinations which are reviewed for substantial evidence.' " (*In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 130 (*Wozniak*).) "[W]e examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

## A. The Rebuttable Presumption of Undue Influence in Interspousal Transfers that Unfairly Advantage One Spouse

Michael contends the trial court erred in applying a rebuttable presumption of undue influence to Maribel's execution of the ITGD. In particular, he asserts this principle was impliedly abrogated in 1985 when the transmutation statutes (§§ 850–853) became effective. We disagree and conclude substantial evidence supported the court's finding that Michael failed to rebut the presumption of undue influence.

As relevant here, the transmutation statutes provide that "married persons may by agreement or transfer, with or without consideration, . . . [¶] . . . [t]ransmute community property to separate property." (Fam. Code,

6

§ 850, subd. (a).)[4]  "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."  (§ 852, subd. (a).)

Here, it was undisputed that Maribel signed the ITGD, which unambiguously "grant[ed]" to Michael as his "sole and separate property" any right, title, and interest, "whether community property or otherwise," that Maribel had in the Property.  Substantially identical language was found to satisfy section 852's writing requirement in *In re Marriage of Kushesh & Kushesh-Kaviani* (2018) 27 Cal.App.5th 449, 454–455 (*Kushesh*).

Significantly, compliance with the statutory writing requirement is simply "a prerequisite to a valid transmutation" and "does not necessarily determine whether a valid transmutation occurred."  (*In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 55 (*Lund*).)  It is well-settled that "whenever there is a transfer from one spouse to another a rebuttable presumption of undue influence arises if the transaction gives one spouse an unfair advantage over the other."  (*Kushesh*, *supra*, 27 Cal.App.5th at p. 456, citing *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 732 (*Burkle*).)  "Generally, a spouse obtains an advantage if that spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits."  (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 629 (*Mathews*).)  "[N]umerous cases apply the presumption of undue influence when the marital transaction is one in which one spouse deeds his or her interest in community property to the other spouse, for no consideration or for clearly inadequate consideration.  [Citations.]" (*Burkle*, at p. 731.)  In cases where property transfers are made without consideration, one spouse "obtains a

---

[4]     Further unspecified statutory references are to the Family Code.

7

benefit at the expense of the other, who receives nothing in return," and this "may be reasonably characterized as a species of unfair advantage." (*Burkle*, at p. 731.)  The presumption of undue influence stems from the fiduciary relationship between spouses expressly described in section 721 as it relates to interspousal transactions.  (*Id.* at p. 729.)[5]

Michael does not dispute that he benefited from the ITGD, or that Maribel was disadvantaged by it.  Nor does he contend the plain language of the transmutation statutes expressly eliminates the presumption of undue influence.  Instead, noting that the presumption dates back to a bygone era when husbands had management and control over community property and could easily obtain oral transmutations of property, Michael asserts the enactment of section 852's writing requirement necessarily and impliedly abrogated this historical presumption.  We are unpersuaded.

"In the absence of express statutory provision, courts will not find an implied abrogation of long established principles." (*Williams v. Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599, 603 (*Williams*); see *People v. Nilsson* (2015) 242 Cal.App.4th 1, 18 (*Nilsson*).)  Notably, case law has long recognized and applied the rebuttable presumption of undue

---

[5]     Section 721, subdivision (b), states in relevant part that the confidential relationship between spouses "imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.  This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code."  These include, but are not limited to, the duties to provide a spouse access to books and records for inspection and copying; to render upon request true and full information of all things affecting any transaction that concerns community property; and to provide an accounting of any benefit or profit derived from any transaction by one spouse without the other's consent concerning community property.  (§ 721, subd. (b)(1)–(3).)

influence in California. (See *Brewer v. Simpson* (1960) 53 Cal.2d 567, 589; *Weil v. Weil* (1951) 37 Cal.2d 770, 788 (*Weil*); *In re Estate of Cover* (1922) 188 Cal. 133, 143–144; *Dimond v. Sanderson* (1894) 103 Cal. 97, 102.) Then in 1984, former Civil Code section 5103 (now Family Code section 721), "which expressly defines the fiduciary duties of spouses in transactions with each other" (*Burkle, supra,* 139 Cal.App.4th at p. 730), codified the principle.

Even after former Civil Code section 5110.730 (now section 852) was enacted in 1984 to overrule case law allowing oral transmutations between spouses (Cal. Law Revision Com. com., 29C pt. 2 West's Ann. Fam. Code (2020 ed.) foll. § 852, p. 167), courts have continued to apply the presumption of undue influence in cases involving facially uneven interspousal transactions. (See, e.g., *Valli, supra,* 58 Cal.4th at p. 1411 ["The presumption of undue influence exists to protect married persons"]; *Kushesh, supra,* 27 Cal.5th at p. 456;[6] *Lund, supra,* 174 Cal.App.4th at p. 55; *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1519–1520; *Burkle supra,* 139 Cal.App.4th at p. 729; *Mathews, supra,* 133 Cal.App.4th at pp. 628–629; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 287.) This is consistent with the legislative history of former Civil Code section 5110.730, which contained no indication of a legislative intent to overrule the long line of Supreme Court and Court of Appeal decisions applying the rebuttable presumption to various interspousal transfers.

Likewise, Michael's implied abrogation theory finds no support in the Legislature's enactment of the Family Code in 1992. The transmutation requirements, previously codified at former Civil Code sections 5110.710 to

---

[6] *Kushesh* recognized the rebuttable presumption of undue influence but remanded the issue to the trial court for determination in the first instance. (*Kushesh, supra,* 27 Cal.App.5th at p. 456.)

5110.740, "were moved, without substantive change, to Family Code sections 850 to 853." (*In re Brace* (2020) 9 Cal.5th 903, 927–928.) And section 721, which codified the rebuttable presumption of undue influence (*Burkle, supra*, 139 Cal.App.4th at p. 729), continued former Civil Code section 5103 "without change" except for substituting gender neutral phrasing. (Cal. Law Revision Com. com., 29C pt. 1 West's Ann. Fam. Code (2020 ed.) foll. § 721, p. 373.) Though the Legislature presumably was aware of section 721 and the many decisions applying the presumption of undue influence when it legislated in 1992, it appears the Legislature did not view the transmutation statutes as altering or abrogating this principle. (See *People v. Ledesma* (1997) 16 Cal.4th 90, 100–101.)

Contrary to Michael's suggestion, the transmutation statutes and the rebuttable presumption of undue influence are not so "mutually exclusive" as to suggest the latter has been impliedly abrogated by the former. (*Nilsson, supra*, 242 Cal.App.4th at p. 18.) The transmutation statutes were enacted "[t]o solve the problem of unreliable evidence in transmutation cases." (*In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1428 (*Bonvino*).) Specifically, the statutes aimed to address the "allure of easy transmutations," which "had encouraged extensive litigation by allowing spouses to ' "transform a passing comment into an 'agreement' or even to commit perjury by manufacturing an oral or implied transmutation." ' " (*Kushesh, supra*, 27 Cal.App.5th at p. 453.) But public policy concerns about unreliable evidence are discernibly distinct from concerns of undue influence among spouses in interspousal property transfers, which are not adequately assuaged by the mere existence of a writing. Indeed, a spouse may still, through duress, undue influence, fraud, or other breaches of their fiduciary

10

obligations, cause the other spouse to execute a writing that satisfies section 852.

Michael argues that continued application of the rebuttable presumption of undue influence will render written transmutation agreements meaningless. We disagree. In order for the presumption to apply, there must first be a threshold showing that a spouse has obtained an unfair advantage over the other. On this score, "a mere benefit is not enough; the advantage must operate 'to the disadvantage' of the other spouse." (See *Burkle, supra,* 139 Cal.App.4th at pp. 731, 735–736 [no unfair advantage where parties obtained mutually agreeable advantages and grantor spouse was advised by attorneys when executing the agreement].) Furthermore, the grantee spouse retains the opportunity to rebut the presumption by demonstrating the transfer was freely and voluntarily made, with full knowledge of the facts and a complete understanding of the effect of the transaction. (See, e.g., *Mathews, supra,* 133 Cal.App.4th at p. 632 [husband who entrusted wife with all financial matters and relied on her judgment and management successfully rebutted presumption that wife's quitclaim deed to husband was due to undue influence]; *Weil, supra,* 37 Cal.2d at pp. 787–789 [wife's deed to husband was voluntary where she was aware that spousal interests were in conflict and she had ample opportunity to obtain independent advice].) In short, application of the presumption does not make the invalidity of written transmutation agreements a foregone conclusion.

Highlighting that section 721 was amended in 2002 to include language stating the confidential relationship between spouses "is a fiduciary relationship subject to the same rights and duties on nonmarital business partners," Michael next contends the presumption of undue influence should no longer be applied because there is no law applying such a presumption

11

when a business partner is able to obtain an advantage over a partner after full and complete disclosure. We again are unconvinced. Far from equalizing the relationships between spouses to the relationships of business partners for all purposes, section 721 expressly emphasizes that spouses are entitled to the "highest" standard of good faith and fair dealing between them (§ 721, subd. (b)) and, similar to nonmarital business partners, are entitled access to records and financial information of the community (§ 721, subd. (b)(1)–(3)). (See fn. 4, *ante*). This conferral of rights in no way suggests the wholesale abrogation of other legal presumptions specifically applicable to spouses under the law.

Having rejected Michael's theory of implied statutory abrogation, we now turn to his alternative argument that the trial court erroneously found he failed to rebut the presumption. We conclude substantial evidence supported the court's decision.

"When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish that the disadvantaged spouse's action 'was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction." (*Burkle*, *supra*, 139 Cal.App.4th at pp. 738–739.) This is a question of fact that will not be reversed on appeal if supported by substantial evidence. (*Id.* at p. 737.)

Here, Maribel's testimony provided substantial evidence that she felt significant pressure to sign the ITGD because Michael "told" her to sign it, and that she felt she had no choice because she was unemployed at the time and could not repay the loan if Michael became unable to do so. Although Michael disputed that he told Maribel to sign the ITGD, the court evidently

12

credited Maribel's testimony over Michael's, and we are bound by that credibility determination. (*Wozniak*, *supra*, 59 Cal.App.4th at p. 131.)

Substantial evidence also supports the trial court's implied finding that Michael failed to demonstrate Maribel executed the ITGD with "full knowledge of all the facts, and with a complete understanding of the effect of' the transaction." (*Burkle*, *supra*, 139 Cal.App.4th at pp. 738–739.) Maribel specifically testified she did not have full knowledge of the fact that she had a community share in the Property. True, the ITGD indicated Maribel's general relinquishment of any right or interest "whether community property or otherwise," but the court could reasonably have determined that Maribel was led to believe the purpose of the ITGD was simply to insulate her from responsibility on the loan. There was no evidence that Maribel was afforded an opportunity to obtain independent advice about the ITGD or its legal effect on her community property interests. And Michael did not testify that he explained the complete legal effect of the ITGD; he simply testified that he relayed the lender's instruction that Maribel had to execute the ITGD if she did not want to cosign the loan. Despite Michael's claim that the ITGD "was explained in full detail" to Maribel by his close friend, Stone, there was no specific testimony that Stone explained the complete legal effect of the ITGD as it related to Maribel's share of community property. Thus, the court could reasonably have concluded that Michael's conclusory testimony was insufficient to demonstrate Maribel's full knowledge and complete understanding of all relevant facts.

In sum, substantial evidence supported the trial court's finding that Maribel did not freely execute the ITGD with full knowledge of the facts and a complete understanding of the document's legal effect.

13

*Lund*, *supra*, 174 Cal.App.4th 40, does not support Michael's contention that the language of the ITGD alone was sufficient to rebut the presumption of undue influence in this case. In *Lund*, the Court of Appeal concluded that an attestation clause in a transmutation agreement stating the husband had carefully read and understood and agreed with all of the provisions of the agreement "served to rebut the presumption that [the husband] did not understand the legal import of the agreement." (*Lund*, at p. 56.) But in so concluding, the court emphasized there was "no other evidence in the record to weigh," since none of the testimony went to the husband's understanding of the legal effect of the agreement. (*Ibid*.) Here, in contrast, there was other evidence to weigh—namely, Maribel's testimony that she was led to believe the legal effect of the ITGD was simply to ensure she bore no responsibility for the loan. On these facts, *Lund* does not control.

Finally, Michael argues that because Maribel never brought an action against him for breach of contract or fiduciary duty within the applicable statutes of limitations, Maribel "is barred by law from making a claim to set aside the ITGD, whether due to alleged undue influence or otherwise." But Michael cites no authority requiring a spouse to file such actions as a prerequisite for application of the rebuttable presumption of undue influence in a later marital dissolution proceeding. "The absence of cogent legal argument or citation to authority allows this court to treat the contention[] as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

For these reasons, we conclude the trial court did not err in concluding that Michael failed to rebut the presumption of undue influence.

## B. The *Moore-Marsden* Rule

"When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro

tanto interest in the property. [Citations.] This well-established principle is known as 'the *Moore/Marsden* rule.' " (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422 (*Bono*), citing *Moore, supra*, 28 Cal.3d at pp. 371–372 and *Marsden, supra*, 130 Cal.App.3d at pp. 436–440.) "The term 'pro tanto' means '[t]o that extent; for so much; as far as it goes.' " (*City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 265, citing Black's Law Dict. (11th ed. 2019) p. 1478.) Thus, the *Moore-Marsden* rule gives a non-titled spouse a beneficial interest in the titled spouse's separate property "to the extent" or "for so much as" community property payments were used to reduce the principal balance of the mortgage.

"[I]n order to determine the separate property interest in the property, the court divide[s] the separate property contributions (down payment and loan amount minus amount by which community property payments reduced principal balance of loan) by the purchase price of the property; to determine the community property interest, the court divide[s] the amount by which community property payments reduced the principal by the purchase price. [Citation.] The community and separate property percentages [are] then multiplied by the total appreciation of the property during marriage to calculate the respective financial interests." (*In re Marriage of Branco* (1996) 47 Cal.App.4th 1621, 1626 (*Branco*).)

In addition to receiving its share of the appreciation of the property, the community is also reimbursed for its loan payments. (See *Marsden, supra*, 130 Cal.App.3d at pp. 439–440 [calculation included community's $9,200 in loan payments plus community's 24.02 percent share of appreciation].)

The *Moore-Marsden* rule applies where, as here, the parties have refinanced a separate property mortgage during marriage and used the proceeds from the community loan to pay off the preexisting separate loan

15

and where community assets are used to pay off the new loan. As one court explained, there appears "no meaningful difference, for purposes of determining whether the community acquires an interest in real property, between the use of community funds to make payments on one spouse's preexisting loan and the use of proceeds from a community property loan to pay off the preexisting separate loan." (*Branco*, *supra*, 47 Cal.App.4th at pp. 1627.)

Michael contends the trial court erred in determining that the community had a *Moore-Marsden* interest because Maribel waived her interest by executing the ITGD. In support, Michael urges us to follow *In re Marriage of Stoner* (1983) 147 Cal.App.3d 858 (*Stoner*). There, a wife purchased a residence with a down payment from separate property funds and a loan taken as a separate obligation. Although community funds were later used to make loan payments, *Stoner* held that the husband had transmuted his community interest by executing a quitclaim deed at the time the loan was obtained, and that the use of community funds to repay the loans was a gift to the community. (*Stoner*, at pp. 863–864.) Recognizing under *Moore* that "[t]he logical presumption . . . is that the loan, as originally secured, was community property in its character" and that "the community has a pro tanto interest in such property," *Stoner* held that "[t]his presumption was, of course, rebutted by the quitclaim deed executed by husband and the community obtained no interest." (*Stoner*, at p. 864, italics omitted.)

This portion of *Stoner* was criticized in *Branco*, which held the *Moore-Marsden* rule "is not a presumption that can be rebutted but a rule to be applied when community funds are used to acquire a residence by reducing the principal owed on the loan by which the property was purchased."

16

(*Branco*, *supra*, 47 Cal.App.4th at pp. 1628–1629.) We need not weigh in on this dispute, as *Stoner* did not involve the issue of undue influence, and the quitclaim deed in that case was found to have effectuated a valid transmutation of the husband's community property interest. (*Stoner*, *supra*, 147 Cal.App.3d at pp. 863–864.) Here, as we have discussed, substantial evidence supports the trial court's finding that Michael failed to rebut the presumption of undue influence in Maribel's execution of the ITGD, rendering the ITGD ineffective to transmute Maribel's share of the community interest. In sum, this case is materially distinguishable from *Stoner*.

Michael further contends the *Moore-Marsden* rule has been impliedly abrogated by the "reimbursement statutes," which he identifies as sections 902, 903, 920, 930, and 931.[7] According to Michael, Maribel had only a section 920 right to reimbursement of her share of the community funds used to pay down Michael's separate property loan that was refinanced during marriage, not a percentage share of the appreciated value of the Property during marriage. We disagree.

To reiterate, courts will not find an implied abrogation of well-established law in the absence of an express statutory provision. (*Williams*, *supra*, 68 Cal.2d at p. 603.) Nothing in the language or legislative history of the reimbursement statutes indicates an intent to abrogate *Moore* or

---

[7]     Briefly, section 902 defines " '[d]ebt' " as "an obligation incurred by a married person before or during marriage, whether based on contract, tort, or otherwise." Section 903 addresses the timing of when a debt is incurred in cases of contracts, torts, or other obligations. Section 930 states the part in which it appears applies to all debts enforced on or after January 1, 1985, regardless of when the debt was incurred. Section 931 states the provisions of the part in which it appears apply to the reimbursement of all debts, regardless of whether satisfied on, before, or after January 1, 1985.

*Mardsen* or their progeny.[8]  Indeed, the *Moore-Marsden* rule is a "well-established principle" of family law (*Bono*, *supra*, 103 Cal.App.4th at p. 1422), and we must assume the Legislature was aware of the rule and its recognition of not only the community's right to reimbursement of community funds used to pay down the debt on a spouse's separate property, but also the community's pro tanto interest in the appreciated value of the property during marriage.  That section 920 mentions only the right to reimbursement is not reasonably construed as an implied abrogation of the remainder of the *Moore-Marsden* rule.  To the contrary, " '[w]hen a rule is so long ingrained in the public policy of the state it must be presumed that the legislature took it for granted rather than sought to alter it in omitting any specific provision for its application.' " (*Williams*, *supra*, 68 Cal.2d at pp. 603–604 citing *Garvey v. Byram* (1941) 18 Cal.2d 279, 281.)

Attempting to avoid this conclusion, Michael maintains the holdings of *Moore* and *Marsden* were not described as a "rule" until *In re Marriage of Allen* (2002) 96 Cal.App.4th 497, and thus, it was not necessary for the Legislature in 1992 to "specifically contemplate any 'rule' associated with *Moore* nor *Marsden* nor have a need to specifically 'abrogate' said rules."  This is simply incorrect.  *Moore* itself recognized that it was applying a " '*rule* developed through decisions in California giv[ing] to the community a pro tanto community property*.*" (*Moore*, *supra*, 28 Cal.3d at p. 371, italics added.)  And other decisions predating the 1992 enactment of the Family Code recognized that *Moore* and *Marsden* articulated a "rule" or "formula" to be applied in similar cases.  (See *In re Marriage of Hebbring* (1989) 207

---

[8]     Section 920, enacted in 1992, continued former Civil Code Section 5120.210 (added by Stats. 1984, ch. 1671, § 9) without substantive change. (Cal. Law Revision Com. com., 29C pt. 2 West's Ann. Fam. Code (2020 ed.) foll. § 920, p. 239.)

18

Cal.App.3d 1260, 1268 ["*Moore-Marsden* formula"]; *In re Marriage of Gowdy* (1986) 178 Cal.App.3d 1228, 1233 [describing "pro tanto interest rule" of *Moore* and earlier cases]; *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1008 [same].)

In short, the *Moore-Marsden* rule is alive and well, and the trial court correctly applied it to determine that the community had a pro tanto interest in the Property.[9]

## C. Characterization of Fire Insurance Proceeds

Michael contends the trial court erred in characterizing the fire insurance proceeds as community property based on the payment of premiums from community funds. This contention fails.

"[T]he general rule is that insurance proceeds retain the same character as the premium paid." (*Estate of Nereson* (1987) 194 Cal.App.3d 865, 873 (*Nereson*), citing *Grimm v. Grimm* (1945) 26 Cal.2d 173, 175 [because all premiums were paid with community funds, "the policy was therefore community property at the time of the property settlement agreement"]; see *Valli, supra,* 58 Cal.4th at pp. 1400–1406 [rejecting wife's argument that life insurance policy purchased by husband with community property funds during marriage was transmuted to wife's separate property due to husband's act of placing policy solely in wife's name].)

Here, the trial court found the fire insurance policy was purchased with community property funds, and Michael does not contend this finding lacked substantial evidence. Instead, Michael maintains the court's reliance on *Nereson* was misplaced because in that case, the community residence

---

9       Michael does not challenge the trial court's determination of the community's and Michael's separate property interests based on Carpenter's calculations and testimony.

repaired with fire insurance proceeds became the surviving husband's separate property after the wife predeceased him, and its status as a community asset "was only later *resurrected*" because the husband died intestate, allowing the wife's heirs to assert statutory heirship under Probate Code section 229. This is a distinction without a difference. As relevant here, *Nereson* held that fire insurance proceeds were not community property after the surviving husband's death because, among other things, the wife's heirs did not establish a community property source for the premium. (*Nereson*, 193 Cal.App.3d at p. 873.) Here, it is undisputed that community funds were used to pay the fire insurance premiums.

Michael further contends the trial court's conclusion is undermined by a statement in *In re Marriage of Burwell* (2013) 221 Cal.App.4th 1 (*Burwell*) that the proceeds of a term life insurance policy "belong to whomever the insurance company is contractually obligated to pay." (*Burwell*, at p. 19.) From this, Michael concludes that because the fire insurance checks were issued to him as the titled owner of the Property, the proceeds had to be characterized as his separate property. We find no merit in Michael's application of *Burwell* to the instant facts.

*Burwell* involved the complexities of characterizing term life insurance proceeds when an insured (1) became medically uninsurable during a term of coverage paid for by the community; (2) died after separation during a new term of coverage paid for by the separate estate; but (3) was only able to maintain coverage during the final term by "appropriat[ing] a community asset"—e.g., a contractual right to renewal or cap on premiums obtained during a prior term of coverage paid for by the community. (*Burwell*, *supra*, 221 Cal.App.4th at p. 21.) The remark that Michael lifts from *Burwell* ("proceeds belong to whomever the insurance company is contractually

obligated to pay") was part of the court's explanation that the community is technically not entitled to payment of proceeds when the insured's separate estate pays the final coverage term. (*Burwell*, at p. 19.) But *Burwell* recognized that "the characterization of the proceeds as separate or community 'will depend on the . . . premium for the final term of the policy,' " and that the community "must be reimbursed to the extent it owns or has an interest in the contractual rights used by the separate estate to obtain the final coverage term" (e.g., right of renewal, premium caps). (*Id*. at p. 20.) In short, *Burwell* does not alter the general rule that the character of insurance proceeds is the same as the character of the premiums; it just considers the additional matter of whether the community is entitled to reimbursement for certain contractual rights peculiar to term life insurance. Those considerations do not apply here.

Still, Michael argues that because fire insurance is subject to mandatory renewal under the Insurance Code, "[i]t is the insured's abstinence from certain acts that assures a right of renewal of the property insurance" and thus, "the community can contribute nothing to secure a contractual right of renewal." (Italics omitted.) But the right of renewal is beside the point; the pivotal question is whether the community has contributed to the payment of premiums for an applicable term of coverage. If, as here, community funds were used to pay the premiums on a fire insurance policy, the character of those funds determines the character of the proceeds. (*Nereson, supra*, 194 Cal.App.3d at p. 873; see *Burwell, supra*, 221 Cal.App.4th at p. 24 ["[t]he proceeds are entirely community when the final premium is paid solely with community property"].)

Finally, Michael claims the trial court erred in finding that the community had an interest in the fire insurance proceeds because Maribel

21

admitted to being the proximate cause of the fire, and it is "antithetical" to negligence law to "reward a tortfeasor for his or her negligence that has resulted in injury to the property of another party." Because Michael fails to adequately support this contention with supporting authority and argument, we treat the issue as forfeited. (*In re Marriage of G.C. & R.W.* (2018) 23 Cal.App.5th 1, 18, fn. 16.)

For these reasons, we conclude the trial court did not err in determining that the fire insurance proceeds were community property.

### D. Characterization of Loan Proceeds

"Loan proceeds acquired during marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so. Without satisfactory evidence of the lender's intent, the general presumption prevails." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187; see *Bonvino*, *supra*, 241 Cal.App.4th at p. 1423 [presumption that loan proceeds acquired during marriage are community property "can be rebutted by showing the lender intended to rely on the spouse's separate property alone."].)

The trial court found Michael failed to meet his burden of proving that the lender relied solely on his separate property in refinancing the loan in 1999. We see no error. The sole evidence Michael offered to prove the lender's intent was the loan application he completed for the refinance. The application form provided an area for listing assets and liabilities and stated that the schedules could be completed jointly by both married and unmarried coborrowers if their assets were joined; "otherwise separate Statements and Schedules are required." On Michael's application, a box was checked indicating that the statement was completed "Jointly," which could have

suggested to the lender that the listed assets were not his separate property. Although Michael clarified in his testimony at trial that the bank accounts were solely in his name, Michael has not pointed to any evidence or testimony that the lender knew this to be the case. The record also discloses no evidence as to whether the listed vehicles were Michael's separate property, and even if so, that the lender knew they were solely his assets and not assets of the community.

More importantly, the loan application listed Michael's monthly employment income and identified no other income deriving from Michael's separate property. "[A] basic tenant of community property law" is that "[i]ncome earned during the marriage belongs equally to the community regardless of who earned it." (*In re Marriage of Mullonkal & Kodiyamplakkil* (2020) 51 Cal.App.5th 604, 616, citing § 760 and *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850–851.) The trial court could reasonably have concluded the loan proceeds were community property because Michael's employment earnings during marriage were listed (and ultimately used) as the primary source of income for the loan. (See *Bonvino*, *supra*, 241 Cal.App.4th at p. 1424 [upholding "finding that . . . loan proceeds were community property, because [the] husband's salary [was] the primary source of income listed on the loan application"].)

Michael next argues that any claim Maribel had for reimbursement of her community share of the loan proceeds was untimely under section 920. This statute, which recognizes a spouse's right to reimbursement for property applied to the satisfaction of a debt, specifies that the right "shall be exercised not later than the earlier of the following times: [¶] (1) Within three years after the spouse in whose favor the right arises has actual knowledge of the application of the property to the satisfaction of the debt.

[¶] (2) In proceedings for division of community and quasi-community property pursuant to Division 7 (commencing with Section 2500) or in proceedings upon the death of a spouse." (§ 920, subd. (c)(1)–(2).) Michael argues that because each mortgage payment using community funds, from the first payment in 1999 until the refinanced loan was paid off in June 2015, triggered a claim for reimbursement, Maribel's claims are now untimely under the three-year statute of limitations.

We are ultimately unpersuaded, as Michael fails to cite evidence in the record demonstrating Maribel's "actual knowledge" that community funds were applied to the satisfaction of the refinanced loan. (§ 920, subd. (c)(1).) Although Michael contends that Maribel "was aware that [he] used his community property income and savings (derived from the fire insurance proceeds) to make each and every monthly mortgage payment on Property during the marriage," the record citations in Michael's brief do not match these representations. It is Michael's obligation to support his factual assertions with accurate citations to the record (Cal. Rules of Court, rule 8.204(a)(1)(C)), "[a]nd we will not scour the record on our own in search of supporting evidence" (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149).

That said, through our review of the record, we are aware of Maribel's testimony that during a three-year period when Michael was unemployed, fire insurance proceeds that Michael had placed into an annuity account were used to make payments on the refinanced loan. But for purposes of determining the timeliness of Maribel's claim for reimbursement of her share of these funds, the testimony was unclear. When asked to identify the years that Michael was unemployed, Maribel testified, "Maybe he can answer that. I'm not sure. 2000—maybe '13." And when Michael subsequently took the

24

stand and had the opportunity to clarify the period of his unemployment for statute of limitations purposes, he simply described his unemployment as "on and off," without narrowing the time span in any way. On this record, we imply an appropriate finding by the trial court that Michael failed to carry his burden as the party asserting the statute of limitations defense to affirmatively prove that Maribel had actual knowledge that community funds were applied to the satisfaction of the refinanced loan more than three years before she filed her petition for dissolution. (§ 920, subd. (c)(1).)

For the above reasons, we conclude the trial court did not err in determining that the loan proceeds were community property.

### E. *Watts* **Charges**

"*Watts* charges are used to compensate the community when one spouse has the exclusive use of a community asset, most often the couple's residence, between separation and trial. The spouse using the property is charged ' "for the reasonable value of that use." ' [Citation.] [¶] The trial court has discretion, based on equitable considerations, as to whether to impose *Watts* charges and in what amount." (*In re Marriage of Mohler* (2020) 47 Cal.App.5th 788, 796–797 (*Mohler*).) In assessing *Watts* charges, courts may consider "the 'reasonable rental value' of the home as a guidepost in attempting to ensure that the 'net fiscal impact' of a spouse's occupation of the home is reflected in the division of the couples' property." (*Id.* at p. 797.)

"*Watts* charges typically have been applied where the community owns the entire property, for example, because it was purchased with community funds during the marriage." (*Mohler, supra,* 47 Cal.App.5th at p. 797.) In *Mohler*, the court held that the *Moore-Marsden* rule may also be used to calculate a reduced amount of *Watts* charges for a spouse's postseparation occupation of a property that "is not *entirely* community property, but rather

25

is treated as *partially* community property due to the *Moore/Marsden* rule." (*Mohler*, at p. 791.)  As *Mohler* explained, trial courts have discretion, based on equitable considerations, to apply *Watts* charges to compensate the community for its loss of rental income due to a spouse's postseparation occupation of property in which the community "maintains a beneficial partial interest . . . due to a *Moore/Marsden* calculation."  (*Mohler*, at pp. 796, 797.)  "The concept is precisely the same as *Watts* charges when the community maintains title to the home, but with the amount charged discounted for the fact that the community maintains only a partial interest in the property for purposes of dividing the property upon a marital dissolution."  (*Id.* at p. 797.)

Here, the trial court properly applied *Mohler* in awarding *Watts* charges for Michael's postseparation use of the Property.  The court awarded the community an amount equal to the monthly fair rental value of the Property, discounted for the community's partial (i.e., 70.92 percent) interest under the *Moore-Marsden* rule, for the 28 months between the parties' separation and their submission of closing arguments.

Michael insists *Mohler* was wrongly decided and urges us not to follow it.  He contends *Mohler* is "antithetical to separate property rights" under section 752, which provides that neither spouse has an interest in the separate property of the other "[e]xcept as otherwise provided by statute," because no statute exists for awarding *Watts* charges to the community based on its partial interest in a spouse's separate property.  But Michael cites no authority suggesting that section 752 bars a court's equitable consideration of the community's beneficial interest under the *Moore-Marsden* rule when exercising its discretion to award *Watts* charges.  (Cf. *Mohler*, *supra*, 47 Cal.App.5th at pp. 796–797 [family law courts are courts of equity and trial

26

courts have discretion based on equitable considerations to impose *Watts* charges].)  To the extent Michael believes the language of section 752 embodies an implied abrogation of the *Moore-Marsden* rule, we reject that suggestion for the reasons already discussed.

Michael further argues that *Mohler* failed to reconcile its award of *Watts* charges based on fair rental value with section 770, subdivision (a)(3), which provides that the "rents" of the separate property of a married person are also that person's separate property.  Unlike Michael, we do not read *Mohler* as mischaracterizing "rents" in violation of section 770, subdivision (a)(3).  *Mohler* simply recognized that trial courts have discretionary authority to consider the reasonable rental value of a home "as a guidepost in attempting to ensure that the 'net fiscal impact' of a spouse's occupation of the home is reflected in the division of the couples' property."  (*Mohler*, *supra*, 47 Cal.App.5th at p. 797.)  There is nothing to suggest that section 770, subdivision (a)(3), erects an impediment to that equitable determination.

Michael warns that *Mohler* will lead to absurd results, such as preventing a recently-married spouse from disposing of their separate property without the consent of the community after just a single mortgage payment is made from community earnings.  For what it's worth, *Mohler* seems to have anticipated and navigated around this issue by electing to use the term " 'beneficial interest' " (as distinct from a legal interest) "to describe the community's *Moore/Marsden* interest in property that is titled in an individual spousal owner."  (See *Mohler*, *supra*, 47 Cal.App.5th at p. 792, fn. 1.)  Though Michael insists that *Mohler*'s reasoning ineluctably leads "down this disturbing path of finding that *Moore* grants a community legal ownership of separate property," we, like *Mohler*, express no opinion on that question, as it is not before us.  Michael does not contend, nor does the record

27

support, that he was prevented from disposing of the Property after separation by Maribel's refusal to consent. "[O]ur role is limited to ruling on the factual matters before us, not hypothetical situations." (*Williams v. Superior Court* (2007) 147 Cal.App.4th 36, 55.)

On the record before us, we reject Michael's contentions that *Mohler* was wrongly decided and conclude the trial court properly awarded discounted *Watts* charges to the community for Michael's postseparation occupation of the Property.

## DISPOSITION

The judgment is affirmed. Maribel is entitled to her costs on appeal.


_____
Fujisaki, Acting P.J.


WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*Herrera v. Herrera* (A162657)